Civ. No. 13-1292 (GAG)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

COMPUTER AUTOMATION
SYSTEMS, INC.,

Plaintiff,

v.                                                                                    Civ. No. 13-1292 (GAG)

INTELUTIONS,

Defendant.

## OPINION AND ORDER

Computer Automation Systems ("CAS") sued Intelutions for, *inter alia*, copyright infringement. The court denied Intelutions's motion to dismiss. (See Docket Nos. 19 & 30.) Intelutions counterclaimed that CAS breached federal antitrust law, 15 U.S.C. §§ 2, 15(a), and CAS moved to dismiss the counterclaim. (See Docket Nos. 43 & 49.) For the following reasons, the court **GRANTS** the motion to dismiss the counterclaim at Docket No. 49.

### I.   Standard of Review

"The general rules of pleading require a short and plain statement of the claim showing that the pleader is entitled to relief." Gargano v. Liberty Intern. Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009) (citations omitted) (internal quotation marks omitted). "This short and plain statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

**Civ. No. 13-1292 (GAG)**

Under Rule 12(b)(6), a defendant may move to dismiss an action against him for failure to state a claim upon which relief can be granted. See FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. The court must decide whether the complaint alleges enough facts to "raise a right to relief above the speculative level." Id. at 555. In so doing, the court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. Parker v. Hurley, 514 F.3d 87, 90 (1st Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]' -'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

A plaintiff need not allege sufficient facts to meet the evidentiary *prima facie* standard. See generally Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49 (1st Cir. 2013). *Prima facie* elements "are part of the background against which a plausibility determination should be made." Id. at 54 (external citations omitted). "[T]he elements of a *prima facie* case may be used as a prism to shed light upon the plausibility of the claim." Id. (emphasis added).

## II.     Relevant Factual Background

The court discussed the facts in detail in denying Intelutions's motion to dismiss and recites only the relevant facts.  (See Docket No. 30.)  In this counterclaim, Intelutions alleges CAS "attempt[ed] to eliminate competition through illegal acts of monopolization." (Docket No. 43 at 12.)

CAS licensed its product ("SEAS") to the Puerto Rico Department of Education ("PRDE") on an annual basis from 2006 to 2012 to help the PRDE with federal reporting requirements concerning special needs students.  On May 10, 2010, Intelutions entered into a service contract on an hourly pay basis with the PRDE to set up a data warehouse for the Department of Special Education ("DSE").  (Id. at 13.) Intelutions learned that the PRDE was dissatisfied with SEAS's numerous deficiencies, CAS's lack of cooperation, and its occasional, unjustifiable shutdown of its services to the PRDE.  (Id. at 14.) Intelutions alleges CAS never attempted to remedy the deficiencies.  (Id.)  In shutting off its services, CAS "knew that the [DSE] would be gravely impaired in all of its federal reporting requirements and would not be able to provide the necessary services and functions for the special needs students . . . ."  (Id. at 17.)  Consequently, and because it was pleased with Intelutions's work, the PRDE amended its service contract with Intelutions on August 29, 2011 to take on a larger role with the PRDE.  (Id. at 14-15.)

The amended contract called for the development of a customized software application facilitating access to the Individual Education Program, which was later called MiPE.  (Id. at 15.)  MiPE was intended to work in conjunction with SEAS and they were used simultaneously beginning in February 2012.  (Id.)  Contract renewal negotiations between the PRDE and CAS fell through in October 2012.  (Docket No. 43

3

at 16.) The PRDE informed Intelutions that MiPE would need to satisfy SEAS's functions to continue serving special education reporting requirements in Puerto Rico. (Id.) MiPE was "much better and much less expensive" than SEAS. (Id.)

Intelutions alleges CAS "thought it had a stranglehold on [the] PRDE since it had licensed SEAS . . . for the prior six years." (Id.) CAS sued Intelutions in Arkansas federal district court in 2012 and the court dismissed the complaint for lack of *in personam* jurisdiction. Intelutions claims CAS neglected to include the PRDE as a defendant because it would defeat CAS's true goal of establishing a monopoly. (Id. at 18.) Intelutions also alleges that CAS intervened in a class action to compel the PRDE to use SEAS and cease use of MiPE. (Id.) Intelutions claims MiPE is more efficient and cost-efficient, and that it could offer to create similarly customized software for school districts throughout the United States.

**III.    Discussion**

Intelutions counterclaims pursuant to 15 U.S.C. §§ 2, 15(a). (Id. at 12, 21.) CAS moved to dismiss for three reasons: 1) Intelutions lacks standing; 2) Intelutions failed to define the relevant market, in terms of product and geography, that CAS has attempted to monopolize or monopolized; and 3) Intelutions has failed to state a claim for breach of antitrust law. (Docket No. 49 at 5.) Because Intelutions lacks standing and states no plausible claim for monopolization or attempted monopolization, the court refrains from opining on the remaining issues.

    A.    <u>Antitrust Injury</u>

A six-factor test governs whether a plaintiff has standing to bring an antitrust action. The relevant factors are: (1) the causal connection between the alleged antitrust

**Civ. No. 13-1292 (GAG)**

violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages. Sterling Merch. Inc., v. Nestle, S.A., 656 F.3d 112, 120-21 (1st Cir. 2011) (citations omitted). The causation requirement is particularly important. Id. The absence of an antitrust injury will generally defeat standing, and Plaintiff bears the burden of demonstrating that standing exists. Id. (citations omitted) (quotation marks omitted).

### 1. Failure to Allege Injury

Antitrust injury should be the type of loss that the claimed violations would be likely to cause and should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. Sterling, 656 F.3d at 121. "Plaintiffs must show not only that they were injured as a result of the defendant's actions and that those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause to competition." Id.

Competitors "may suffer injury even when there is no injury to competition or to consumers, and so lack standing." Id. "Further, unlike consumers, competitors have incentives to bring antitrust suits for purposes which are anti-competitive . . . [and, consequently,] there is reason for courts to be properly skeptical of many rivals' suits, particularly when the practices are not obviously 'exclusionary.'" Id. (citations omitted). However, "A reduction in output and an increase in prices in the relevant market" typically constitute injury to competition. Id. (citations omitted).

5

Failure to allege that consumer prices increased during the relevant time period militates towards dismissal.  See Sterling, 656 F.3d at 122.  Similarly, when consumer prices decrease during the relevant time period, no antitrust violation likely exists.  Id.  Increased sales, profits, and market share during the relevant time period "provides further indication that no antitrust injury exists . . . ." Id. at 122-23.

With these principles in mind, the court finds that Intelutions lacks standing for failure to allege an antitrust injury.  Intelutions generically alleges, "CAS thought it had a stranglehold on [the] PRDE since it had licensed SEAS to PRDE for the prior six years," and that "CAS believed that its monopoly power in Puerto Rico would force the PRDE to comply with its demands" in light of the sporadic shutdowns.  (Docket No. 43 at 17.) CAS, furthermore, has offices in eleven states and provides SEAS to thousands of United States school districts, including all of the districts in Puerto Rico, thereby preventing Intelutions from entering the market.  (Id.)  Lastly, Intelutions claims that intervention in a state class action and instigation of this case exemplify vexatious litigation meant to stymie Intelutions's entry into and increased percentages of market share.  (Id. at 18-20.)

Intelutions, however, fails to allege antitrust injury.  The complaint actually states numerous allegations demonstrating that neither injury nor market restraint occurred and that Intelutions did quite well.  Paragraphs 13, 14, 17, 18, 26, 29, and 30 of the counterclaim substantiate this determination.  They state, in relevant part, as follows:

- The PRDE "entered into a number of different contracts with Intelutions to achieve [streamlining and updating all of its technology and attempting to cut costs]," and, the PRDE "contracted with Intelutions to develop a new tool which replaced the SAP tool and now costs the PRDE a nominal fee per year," as opposed to the $500,000 it paid annually to SAP. (Docket No. 43 at 15.)

- MiPE and SEAS were being used simultaneously by the Department of Special Education to meet all of its reporting requirements.  (Id.)

- When negotiations with CAS to renew the agreement failed, the PRDE met with Intelutions and informed them that MiPE would have to fully replace SEAS in all modules and functionalities. (Id. at 16.)

- The PRDE had fully intended to renew the contract with CAS until it refused, but the MiPE software turned out to be much better and much less expensive. MiPE became the PRDE's own customized software. (Id.)

- MiPE and SEAS are completely incompatible systems and the PRDE solicited development of MiPE from Intelutions. (Id. at 18.)

- The PRDE is no longer dependent on CAS. (Id.)

- The PRDE invested approximately $1.5 million dollars to develop MiPE, which it now owns. MiPE is much more cost effective than SEAS, since it no longer has to pay a two million dollar annual licensing fee. (Id. at 18-19.)

- Since its full launching in October 2012, MiPE has been operating successfully. (Id. at 19.)

Intelutions's counterclaim alleges that the PRDE entered into agreements not only with CAS, but also with Plaintiff and with a company called SAP at the same time. MiPE was much more cost-efficient than SEAS, costing the PRDE a one-time fee of only $1.5 million, versus a $2 million annual fee. The PRDE also used SEAS and MiPE or other Intelutions services simultaneously and chose MiPE after CAS's product allegedly faltered. (Docket No. 43 at 16.) Intelutions also claims MiPE is both different from and superior to SEAS, and that it now operates successfully for the PRDE, while CAS does not have any operating agreement with the PRDE. Clearly, according to Intelutions, the PRDE and Puerto Rico benefitted financially and technologically from the change. The court fails to see a plausible claim for injury or market restraint. See Sterling, 656 F.3d at 121-23.

   2.   **Co-Existence and Market Domination**

7

In Sterling, the First Circuit stated, "Short contract terms and low switching costs generally allay most fears of injury to competition. Sterling points to Nestlé PR's five-year, 90 percent exclusive contract with Ralph's as support for its claim," but it "allows other distributors at least limited access." Id. at 124. Indeed, Sterling failed to show that the competitor's exclusive agreements yielded adverse effects on competition. Id.

The same goes for Intelutions and CAS here. Even though CAS allegedly had 100 percent of the market share, it only had one-year licensing agreements with the PRDE, and Intelutions states that other competitors, such as itself and SAP, could also contract with the PRDE. Indeed, the PRDE allegedly believed MiPE was technologically superior and financially more attractive, resulting in the PRDE's choice not to renew its contract with CAS and choose Intelutions. Intelutions was not foreclosed from competing in, advancing through, and dominating its particular market in Puerto Rico. Furthermore, although Intelutions alleges CAS occupied 100 percent of the market when it had a licensing agreement with the PRDE, the PRDE nonetheless was able to simultaneously contract with Intelutions and SAP. Lastly, Intelutions does nothing to advance the argument that the exclusive agreements yielded adverse effects on competition. These factors gravitate towards dismissing the counterclaim. See Sterling, 656 F.3d at 124.

### B. Monopolies and Attempted Monopolies

The Sherman Act outlaws monopolization or "attempt[s] to monopolize . . . any part of the trade or commerce among the several states." Diaz Aviation Corp. v. Airport Aviation Servs., 716 F.3d 256, 265 (1st Cir. 2013). Monopolization means "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or

8

maintenance of that power as distinguished from growth or development as a consequence of a superior product, business, acumen, or historic accident." Id. (citations omitted).  "The elements of attempted monopolization are (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) the specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" exists.  Id. (citations omitted) (quotation marks omitted).  "Monopoly power is the power to control prices or exclude competition."  United States v. E.E. DuPont de Nemours & Co., 351 U.S. 377, 391 (1956).  Monopoly power is typically proven by defining a relevant market and showing that the defendant has a dominant share of that market.  Coastal Fuels of P.R., Inc. v. Caribbean Petrol. Corp., 79 F.3d 182, 195 (1st Cir. 1996) (citation omitted).

There is no doubt that the complaint fails to state a claim for on-going monopolization or attempted monopolization.  The complaint makes clear that CAS and the PRDE have no licensing agreement; indeed, taken in the light most favorable to Intelutions, Intelutions prevailed in its struggle against CAS and CAS currently has no market presence.   No monopoly power thus exists.

As to an attempted monopoly, i.e., an existing dangerous probability of monopoly power, Intelutions's complaint frequently reiterates the superiority and more economically reasonable nature of MiPE when compared with SEAS, particularly how the PRDE first preferred and now owns MiPE, effectively eliminating a need to ever use SEAS again.  Therefore, CAS has no dominant share of the market, cannot control the price or threaten competition, and is incapable of threatening to do so with dangerous probability.  Indeed, aside from its copyright claim that surmounted a motion to dismiss, CAS does nothing to indicate that it is a threat to enter the market under Intelutions's

rationale. Taking the facts in the complaint in the light most favorable to Intelutions, no on-going monopoly or attempt to monopolize exists.

Intelutions also fails to state a claim for both past attempted monopoly and actual monopoly. Intelutions describes CAS as having a "stranglehold" on special education software in Puerto Rico. Its complaint, however, regales the court with how it triumphantly overcame the deficient and costly SEAS to coexist in the special education software hierarchy and ultimately usurp CAS's power over the PRDE.

Concerning attempted monopolization, Intelutions's only allegations lie in CAS's involvement in two litigation proceedings: the first as an intervener in a state class action suit, and the second for copyright infringement. The court sees little merit in arguing that the underlying complaint in this case constitutes bad faith litigation. CAS allowed Intelutions proprietary access to SEAS. It claims to have a witness who heard Intelutions's representatives discuss reverse engineering SEAS in the months before Intelutions contracted with the PRDE to provide an ostensibly identical service that ultimately yielded MiPE. As the court previously stated, it is plausible that copyright infringement occurred. (See Docket No. 30.) Surely a copyright infringer may not enjoy immunity from the party it allegedly harmed simply because the harmed party previously had a higher percentage of the market share and a larger national presence.

As for Intelutions's argument that CAS improperly intervened in the state class action, Intelutions fails to specify why. It states, in a conclusory manner, that intervention was improper, without providing any details, elaboration, or legal arguments in its opposition to the motion to dismiss. The complaint also offers no details upon

which relief may be granted. The court is not responsible for figuring that out. See U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Lastly, Intelutions's argument that CAS had a monopoly over Puerto Rico's special education software holds no water. Intelutions's story portrays CAS as Dionysius and the PRDE as Damocles: on a whim and without notice, CAS could have crippled the PRDE's ability to meaningfully monitor and report on special needs students. Indeed, CAS failed to respond to the PRDE's requests and SEAS failed sometimes, leaving the PRDE in peril during a time of great need. This may be true, as it would be when taken in the light most favorable to Intelutions, but it does not mean that CAS held monopoly power over the PRDE. "Monopoly power . . . requires . . . something greater than market power . . . ." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481 (1992).

Intelutions unabashedly touts the lifeline it threw the PRDE in its darkest hour with the creation of MiPE in 2011 and eventual takeover of the market in 2012. In the land of the unbiased, however, this just means that the PRDE thought Intelutions created a better product and chose MiPE over SEAS, thereby demonstrating that CAS did not dominate the market, control prices, and exclude competition. Furthermore, the PRDE was bound to CAS only on an annual basis. If the PRDE was pigeonholed by CAS's shutdowns, threats, and failure to timely act, it could have sought a temporary restraining order, injunctions, and relief for breach of contract. But no plausible claim for a monopoly exists.

The U.S. Department of Justice provided an example germane to Intelutions's counterclaim in its report on competition and monopolies, which assesses single-firm conduct under section 2 of the Sherman Act.

> In markets characterized by rapid technological change . . . a high market share of current sales or production may be consistent with the presence of robust competition over time rather than a sign of monopoly power.  In those situations, any power a firm may have may be both temporary and essential to the competitive process.  Indeed, in the extreme case, market structure may be a series of temporary monopolies in a dynamically competitive market.

U.S. DEP'T OF JUSTICE, COMPETITION AND MONOPOLY: SINGLE-FIRM CONDUCT UNDER SECTION 2 OF THE SHERMAN ACT (2008), www.usdoj.gov/atr/public/reports/236681.htm.

It stands to reason that the PRDE would want to contract with only one company to perform the software service for which Intelutions and CAS competes.  Requiring a government agency to hire multiple firms to complete a task which one can accomplish for the sake of competition defies logic.  One firm had to win; that does not mean that the other was foreclosed from attempting usurpation.  Indeed, that happened, and Intelutions ostensibly succeeded.  The motion to dismiss is **GRANTED.**

C.      Intelutions' Arguments

Intelutions argues that CAS misapplies Sterling because Sterling considered the grant of a summary judgment motion instead of a motion to dismiss, and the First Circuit has counseled against the "slow influx of unreasonably high pleading requirements at the earliest stages of antitrust litigation . . . ." (Docket No. 60 at 5.)  The court is aware of the First Circuit's opinion warning district courts to abide by the pleading requirements and still finds Sterling's factors useful for the purpose of a plausibility inquiry.  See

**Civ. No. 13-1292 (GAG)**

Evergreen Partnering Group, Inc. v. Pactiv Corp., 720 F.3d 33, 43-44 (1st Cir. 2013). Said another way, the court is not relying on factual conclusions, credibility determinations, or Sterling's holding to justify its decision; rather, it is ascertaining whether the facts alleged in the complaint, taken in the light most favorable to Intelutions, plausibly state a claim for relief under the factors Sterling enunciated.  The court also considered whether Intelutions is plausibility entitled to relief through an assessment of its monopoly argument.  Finding no plausibility based on the discussion above, the court **DISMISSES** the counterclaim.

**IV.     Conclusion**

    For the reasons stated above, the counterclaim at Docket No. 43 is **DISMISSED.**

    It is so **ORDERED** this 24th day of February 2014.

                                                             **/s/ Gustavo A. Gelpi**
                                                           Hon. Gustavo A Gelpi
                                                           U.S. District Judge